# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00198-CV

---

**UnitedHealthcare Insurance Company and Sierra Health and Life Insurance Company, Inc., Appellants**

**v.**

**Ken Paxton, Attorney General of Texas; Teacher Retirement System of Texas; Humana Insurance Company; Humana Insurance Company of New York; and Humana Insurance Company of Puerto Rico, Inc., Appellees**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-21-002888, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

---

## O P I N I O N

UnitedHealthcare Insurance Company and Sierra Health and Life Insurance Company (collectively, United) appeal from the district court's final judgment denying United's request for a declaration under the Texas Public Information Act (PIA). *See* Tex. Gov't Code §§ 552.001–.353. United filed suit to prevent disclosure of information related to a contract between United and Teacher Retirement System of Texas (TRS) concerning TRS's Texas School Retired Employees Group Benefits program (TRS-Care), which serves eligible retirees of TRS's pension program and their dependents. The district court entered final judgment which denied United's requested relief and compelled TRS to produce the requested documents. For the following reasons, we affirm.

**BACKGROUND**

This subject of this appeal is a contract between United and TRS (the Contract). TRS is a state-authorized trustee that administers TRS-Care, a program that serves eligible retirees who participate in TRS's pension program and their dependents. In July 2019, TRS issued a request for proposal to solicit proposals from vendors to provide a fully insured Medicare Advantage plan for eligible TRS-Care participants. Both United and Humana Insurance Company (Humana) submitted bids.[1] After all proposals were submitted, TRS issued two best and final offer (BAFO) requests—one of which contained a request for gain sharing. The BAFO that requested gain sharing asked the finalist vendors to either "(1) provide the shared savings payment in excess of the TRS premium or (2) hold any shared savings in excess of premium into an account to be used for future premium offsets." Humana believed the request for gain sharing violated federal law, and in response, notified TRS. After receiving the BAFO response from United, TRS requested that "[United's] legal certify your response to these questions." United's lawyer responded that its legal team was satisfied that its "offer was structured in a way that complied with all applicable laws."

In February 2020, TRS awarded the contract to United. The Contract between United and TRS consists of the Contract itself, along with various exhibits. The Contract states that the TRS-Care program is to be funded by a trust; and amounts are paid into the trust by the State of Texas, public schools, active teachers, and participants of the program. The trust is defined under the Contract as "the Retired School Employees Group Insurance Fund established under Chapter 1575, Texas Insurance Code." United's role under the Contract is to provide fully insured

---

[1] "Humana" includes Humana Insurance Company, Humana Insurance company of New York, and Humana Insurance of Puerto Rico, Inc.

Medicare Advantage plan coverage under the program for Medicare-eligible participants enrolled in TRS-Care. United claims that it receives funds from the federal Center for Medicaid Services (CMS) and that those funds are what are used to pay member claims.

After learning that TRS awarded the contract to United, Humana filed a bid contest, which TRS denied. In March 2021, Humana served TRS with a request for documents under the Texas Public Information Act (PIA), seeking:

(1) A copy of the final executed contract between TRS and United for TRS-Care Medicare Advantage plan for services commencing on or about January 1, 2021 (the Contract), including exhibits;

(2) Unredacted copies of BAFO requests and responses between TRS and United relating to request for proposals No. 19-0000184, including specifically any "legal certifications;"

(3) contract or offer terms or their functional equivalent in the Contract that are identified in sections A through J of Tex. Gov't Code § 552.0222(b)(3); and

(4) offer terms or their functional equivalent made by United in response to Request for Proposals No. 19-0000184 that are identified in sections A through J of Tex. Gov't Code § 552.0222(b)(3).

In response to Humana's request, TRS submitted a request for an Attorney General decision without asserting any exceptions to disclosure on its own behalf. *See* Tex. Gov't Code § 552.301(a) (governmental body that receives written request for information it wishes to withhold under specific exception must ask for decision from attorney general about whether information is within that exception). Both United and Humana submitted extensive briefing to the Attorney General in which United asserted that the information sought was excepted from disclosure under section 552.110 and section 552.1101 of the PIA. *See* Tex. Gov't Code

3

§§ 552.110(a), (b), (c) .110 (trade secrets; commercial or financial information that if released will cause substantial competitive harm); 552.1101(a) (confidentiality of proprietary information). In support, United submitted an affidavit of Craig Condon that explained how and why United believed the relevant exceptions applied to the requested information.

After considering the briefing of the parties, the Attorney General issued Order OR2021-15157 (AG Order), directing TRS to:

(1) Withhold information that the Attorney General identified as applicable under section 552.110(c) (with the exception of United's client information that is publicly available on its website) [and]

(2) Disclose the remaining information.

Put simply, the Attorney General found that some of the information could be withheld on the basis of section 552.110(c) (commercial or financial information that if released will cause substantial competitive harm), while disclosure of the remaining requested information was warranted because either (1) it was contracting information under section 552.0222 to which the exceptions asserted by United did not apply, or (2) United failed to submit sufficient evidence to meet its burden in establishing an exception. After receiving the Order, United filed the underlying suit seeking a declaration under the Uniform Declaratory Judgments Act (UDJA) that the requested information was not subject to disclosure because it fell within various exceptions under the PIA. Humana timely intervened. *See id.* § 552.325(a). United and Humana filed cross-motions for traditional summary judgment. Both parties' respective motions contained the same evidence that was provided to the Attorney General in the parties' letter briefings. After conducting a hearing on the motions and an in-camera review of the information at issue, the district court granted Humana's motion for summary judgment, denied United's motion for summary judgment,

4

affirmed the Attorney General's ruling in AG Order 2021-15157, and ordered TRS to produce the information in accordance with the AG Order. [2]   United timely appealed.

## STANDARD OF REVIEW

On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law.  *See Guynes v. Galveston County,* 861 S.W.2d 861, 862 (Tex. 1993).  When the trial court grants one motion and denies the other, as is the case here, the reviewing court should determine all questions presented.  *See Commissioners Ct. of Titus Cnty. v. Agan,* 940 S.W.2d 77, 81 (Tex. 1997); *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex. 1988).  The reviewing court should render the judgment that the trial court should have rendered.  *See Agan,* 940 S.W.2d at 81; *Members Mut. Ins. v. Hermann Hosp.,* 664 S.W.2d 325, 328 (Tex. 1984).  Whether information is subject to the PIA and whether an exception applies are questions of law that we review de novo.  *See City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000); *see also Genuine Parts Co. v. Paxton*, No. 03-19-00441-CV, 2020 WL 3887973, at *2 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.).

## DISCUSSION

The purpose behind the PIA was and is to provide transparency in governmental affairs to ensure the people "retain control over the instruments they have created." *See* Tex. Gov't Code § 552.001(a).  The PIA guarantees access to public information, subject to certain exceptions. *See generally* Tex. Gov't Code ch. 552; *see also Texas Dep't of Pub. Safety v. Cox Tex.*

---

[2]  The Attorney General submitted a plea to the jurisdiction arguing that United's claims for declaratory relief should be dismissed because they are redundant of the claims brought under the PIA.  The trial court, in its final order, granted the plea.  United does not appeal that portion of the order and therefore it is not at issue in this appeal.

*Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). "Those exceptions embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *Cox Tex. Newspapers, L.P.*, 343 S.W.3d at 114. The PIA defines "public information" in relevant part, as "information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business: (1) by a governmental body; or (2) for a governmental body and the governmental body owns the information or has a right of access to it." Tex. Gov't Code § 552.002(a). The PIA is to be liberally construed in favor of granting requests for information. *See id.* § 552.001(b).

A public information request typically involves the governmental body holding the information and the citizen requesting it; if the governmental body believes an exception applies, it must promptly ask the Attorney General for a ruling. *See id.* § 552.301. Whether an exception under the PIA applies to support withholding information is a question of law. *City of Garland*, 22 S.W.3d at 357. The party seeking the exception bears the burden of establishing that the exception applies. *See Texas Dep't of Pub. Safety v. Abbott*, 310 S.W.3d 670, 673–74 (Tex. App.—Austin 2010, no pet.). Because the PIA is to be "liberally construed in favor of granting a request for information," Tex. Gov't Code § 552.001(b), the exceptions of the PIA must be narrowly construed. *Harris Cnty. Appraisal Dist. v. Integrity Title Co.*, 483 S.W.3d 62, 69 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Close judgment calls are to be resolved in favor of the stated purpose of the legislation. *See Leander Ind. Sch. Dist. v. Office of Att'y Gen.*, No. 03-18-00243-CV, 2018 WL 6581523, at *2 (Tex. App.—Austin Dec. 14, 2018, no pet.) (mem. op.).

*Construing the PIA*

Generally, matters of statutory construction are questions of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective is to give effect to the Legislature's intent as expressed in the statute's plain language. *See* Tex. Gov't Code § 312.005; *see also Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 855 (Tex. 2018). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. *See* Tex. Gov't Code § 311.011(b). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Harris Cnty. Appraisal Dist.*, 483 S.W.3d at 69 (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). However, "[w]hen the plain language of a statute does not convey the Legislature's apparent intent, we may resort to additional construction aids, such as the objective of the law, the legislative history, the common law or former statutory provisions, including laws on the same or similar subject, and the consequences of a particular construction." *Hughes*, 246 S.W.3d at 626. In construing the PIA, we also give "due consideration" to the Attorney General's PIA decisions, even though they are not binding, because the Legislature has directed the Attorney General to determine whether records must be disclosed pursuant to that statute. *See York v. Texas Guaranteed Student Loan Corp.*, 408 S.W.3d 677, 683 (Tex. App.—Austin 2013, no pet.); *see also* Tex. Gov't Code §§ 552.008(b), .306 (requiring Attorney General to render decisions regarding PIA).

Here, United seeks to withhold information based on the exceptions found in section 552.110 and section 552.1101, asserting that all of the requested information contains trade secrets, Tex. Gov't Code § 552.110(a); is confidential and proprietary, *id.* § 552.1101(a); and is

financial or commercial information the disclosure of which would cause United substantial competitive harm, *id.* § 552.110(c). Each of these sections provides as follows:

- Section 552.110(a) of the PIA prevents disclosure of information if "it is demonstrated based on specific factual evidence that the info is a trade secret." *See id.* After the 2019 amendments to the PIA, the term "trade secret" is defined as "all forms and types of information," including (among other things) business information, formulas, designs, compilations, methods, processes, procedures, or financial data, if the owner: (1) has taken reasonable measures to keep the information secret and (2) the information derives independent economic value by not being generally known or ascertainable by another person." *Id.* § 552.110(a).

- Section 552.110(c) provides that "except as provided by section 552.0222, commercial or financial information for which it is demonstrated based on specific factual evidence that disclosure would cause substantial competitive harm to the person from whom the information was obtained is [excepted from disclosure]." *Id.* § 552.110(c).

- Section 552.1101(a) provides that information may be exempted from disclosure if it constitutes confidential or proprietary information that, if released, would give advantage to a competitor. *See id.* § 552.1101(a).

Although United claims these exceptions, United may invoke them only to the extent permitted under section 552.0222(b). *See* Tex. Gov't Code § 552.0222(b) (providing extensive list of types of contracting information to which exceptions in sections 552.110 and 552.1101 do not apply). Accordingly, for United to satisfy its burden that these exceptions apply, United must first show that none of the requested information is the type of contracting information carved out by section 552.0222(b) from the exceptions. For each of Humana's requests, we will examine whether the information that United seeks to withhold is carved out from the exceptions, and if not, whether the exceptions apply.

8

**I.      Whether the Contract and its exhibits should be disclosed (Request No. 1)**

Humana's first request seeks a copy of the final executed contract between TRS and United for TRS-Care services commencing on or about January 1, 2021 (the Contract), including exhibits. While United agrees that the Contract itself is public for the most part, United seeks to withhold certain portions of information contained within Exhibit A (Financial Requirements and Fees), Exhibit B (Performance Guarantees), and Exhibit E (Administrative Requirements), claiming that the information is "confidential and proprietary, commercial and financial information, the disclosure of which would give an unfair competitive advantage to Humana and other competitors of United in future procurements." *See id.* §§ 552.1101(a) (proprietary and confidential bid information), .110(a) (trade secrets), .110(c) (commercial or financial information that, if disclosed, would cause substantial competitive harm to the disclosing party). Condon's affidavit purports to show how these exceptions apply, attesting:

- Portions of Exhibit A include a very specific offer involving credits and a gain sharing arrangement, including definitions and terms proposed, the terms of which are unique to TRS.

- Portions of Exhibit B to the Contract, specifically the dollar amounts identified in the column "TRS-Care MA Proposed At-Risk," constitutes dollars at risk for United associated with very specific performance guarantees that are unique and customized for this particular procurement, disclosure of which would give a competitor insight into United's operations model which was used to formulate the performance guarantee terms, scope, and thresholds.

- Portions of Exhibit E to the Contract, specifically the columns entitled "Response," "Deviations," and "TRS Response," is information that reflects specific customized network, claims administration, clinical and utilization management, customer service proposals, and similar capability-related terms that, if disclosed, would enable Humana and other competitors the ability to meet or beat United's terms.

9

To determine whether United may utilize the above exceptions, however, we must first analyze whether the information in the Contract and its exhibits meets the definition of any of the carve-outs enumerated in section 522.0222(b) (Disclosure of Contracting Information). *See id.* (providing that "[c]ontracting information is public and must be released unless excepted from disclosure under this chapter.")

Effective January 1, 2020, the PIA was amended to define "contracting information" as:

(A) information in a voucher or contract relating to the receipt or expenditure of public funds by a governmental body;

(B) solicitation or bid documents relating to a contract with a governmental body;

(C) communications sent between a governmental body and a vendor, contractor, potential vendor, or potential contractor during the solicitation, evaluation, or negotiation of a contract;

(D) documents, including bid tabulations, showing the criteria by which a governmental body evaluates each vendor, contractor, potential vendor, or potential contractor responding to a solicitation and, if applicable, an explanation of why the vendor or contractor was selected; and

(E) communications and other information sent between a governmental body and a vendor or contractor related to the performance of a final contract with the governmental body or work performed on behalf of the governmental body.

*Id.* § 552.003(1-a), (A-E). Before the 2019 amendments, most contracting information could be excepted from disclosure if the party seeking to prevent disclosure of information could show that the information constituted a trade secret or other proprietary information. After the amendments,

10

however, the statute increased the types of contracting information that could not utilize the trade secret and financial and proprietary information exceptions. Section 552.0222(b) provides:

> (b) The exceptions to disclosure provided by Sections 552.110 and 552.1101 do not apply to the following types of contracting information:
>
>> (1) a contract described by Section 2261.253(a), excluding any information that was properly redacted under Subsection (e) of that section;
>>
>> (2) a contract described by Section 322.020(c), excluding any information that was properly redacted under Subsection (d) of that section;
>>
>> (3) the following contract or offer terms or their functional equivalent:
>>
>>> (a) any term describing the overall or total price the governmental body will or could potentially pay, including overall or total value, maximum liability, and final price;
>>> (b) a description of the items or services to be delivered with the total price for each if a total price is identified for the item or service in the contract;
>>> (c) the delivery and service deadlines;
>>> (d) the remedies for breach of contract;
>>> (e) the identity of all parties to the contract;
>>> (f) the identity of all subcontractors in a contract;
>>> (g) the affiliate overall or total pricing for a vendor, contractor, potential vendor, or potential contractor;
>>> (h) the execution dates;
>>> (i) the effective dates; and
>>> (j) the contract duration terms, including any extension options; or
>>
>> (4) information indicating whether a vendor, contractor, potential vendor, or potential contractor performed its duties under a contract, including information regarding:
>>
>>> (a) a breach of contract;
>>> (b) a contract variance or exception;
>>> (c) a remedial action;
>>> (d) an amendment to a contract;

11

    (e) any assessed or paid liquidated damages;
    (f) a key measures report;
    (g) a progress report; and
    (h) a final payment checklist.

*Id.* United argues that none of the requested information meets the criteria defined in the carve-outs of subsections (1)-(4), and that therefore United is not prohibited from claiming the section 552.110 and 552.1101 exceptions. Humana disagrees and argues that the requested information meets the definition of contracting information pursuant to subsections (1) and (3) above. Accordingly, we start with section 552.0222(b)(1) to determine whether the Contract is one described by section 2261.253.

    Section 2261.253 of the Government Code requires that certain governmental contracts be publicly available on the relevant agency's website. It provides in relevant part:

    (a) For each contract for the purchase of goods or services from a private vendor, each state agency shall post on its Internet website:

      (1) each contract the agency enters into, including contracts entered into without inviting, advertising for, or otherwise requiring competitive bidding before selection of the contractor, until the contract expires or is completed.

*Id.* § 2261.253(a)(1). Subsection (d), however, states that "this section does not apply to a memorandum of understanding, interagency contract, interlocal agreement, or contract for which there is not a cost." *Id.* § 2261.253(d). The parties agree that the information at issue includes a contract between TRS, a state agency, and United, a private vendor. *See id.* § 2261.002(2) ("state agency" has meaning assigned by Government Code Section 2151.002). They also agree that the contract has not yet been completed. However, they disagree as to whether the Contract is exempt from disclosure under subsection (d). United argues that the Contract is exempt from disclosure pursuant to subsection (d) because the Contract between TRS and United "is a contract for which

there is not a cost," *see id.* § 2261.253(d), while Humana disagrees, arguing that the Legislature intended for the amendments to increase transparency in government contracts, precluding United's interpretation of the statute. For the following reasons, we agree with Humana.

To aid us in construing the new carve-out language in section 552.0222, we look to the original purpose of the Public Information Act. The PIA was initially adopted in the 1970s in response to scandals that eroded the public's trust in government. The PIA was intended, and required, to "be construed liberally" in favor of transparency. *See id.* § 552.001(b). However, in 2015, the PIA's goal of transparency was limited as a result of the holdings in *Boeing Company v. Paxton* and *Greater Houston Partnership*. In *Boeing Company*, a former Boeing employee submitted a public information request seeking the lease information between the Port Authority of San Antonio and Boeing. 466 S.W.3d 831, 834 (Tex. 2015). Boeing, a private company, sought to prevent disclosure of information by utilizing the exception provided in section 552.104 (information that, "if released, would give an advantage to a competitor or bidder.") *See id.* (citing Tex. Gov't Code § 552.104).[3] While the exception in section 552.104 normally only applied to governmental entities, the Texas Supreme Court held in *Boeing* that this exception also extended to private parties that wish to protect their competitive business interests. *See id.* at 841. That same year, the Texas Supreme Court in *Greater Houston Partnership v. Paxton* clarified and limited what entities qualify as governmental bodies by restricting the meaning of "supported in whole or in part by public funds." 468 S.W.3d 51, 53 (Tex. 2015). As a result of this strict interpretation, the Court excluded many entities that receive large amounts of public funds from

---

[3] While section 552.104 is not at issue in this case, we note that similar principles apply here. *Compare* Tex. Gov't Code § 552.104 (excepting from disclosure information that would give advantage to competitor) *with id.* § 552.110(c) (excepting from disclosure commercial or financial information that, if released, would cause substantial competitive harm).

13

the definition of a governmental body subject to the PIA. *Id.* at 63. The rulings resulted in a large reduction in the public's access to information about state and local contracting—including final taxpayer-funded contracts. In response, in 2019, the Legislature enacted the amendments to the PIA with the purpose of "restor[ing] transparency to state and local government contracting, while recognizing that some information needs to be protected from disclosure in order to foster competition." *See* Act of May 23, 2019, 86th Leg. R.S., ch. 1216, § 3, 2019 Tex. Sess. Law Serv. Ch. 1216; *see* Texas S.B. 943, Bill Analysis, Author's Statement of Intent (June 11, 2019), available at https://capitol.texas.gov/tlodocs/86R/analysis/pdf/SB00943F.pdf#navpanes=0 (last visited May 2, 2024). The amendments were designed to "strike[] this balance in several ways, including by creating a new exception for contractors' proprietary information . . . and ensur[ing] the public can obtain key contract terms (like overall price and deliverables) and information indicating whether or not a contractor performed its duties under the contract." *Id.*

We must review the rulings on the requests in this case bearing in mind these legislative goals as expressed in the PIA and restated in the 2019 amendments. With these in mind, we turn to construing the statutes.

## A. Determining whether the Contract is "a contract for which there is not a cost" under section 2261.253(d)

The crux of United's argument is that the requested information is exempt from disclosure because the Contract "is a contract for which there is not a cost." *See* Tex. Gov't Code § 2261.253(d). In full, subsection (d) states:

> This section does not apply to a memorandum of understanding, interagency contract, interlocal agreement, or contract for which there is not a cost.

14

United's argument focuses on the fact that it charges TRS a $0 premium for the insurance plan and therefore, United claims, there is no "cost" to TRS associated with the Contract. United argues that the CMS funds are what are used to pay member claims and therefore TRS does not "pay" United anything to administer the Contract. In other words, because TRS does not directly pay United, the Contract is one "for which there is not a cost." In support of this argument, United cites to a chart of monthly premiums (within the already disclosed portion of Exhibit A to the Contract) that show the monthly premiums at $0.00.

| Table 1 - Monthly Premium Rates | | | | | |
|---|---|---|---|---|---|
| UHC - Medicare Advantage TRS-Care | | | | | |
| Plan Year | 2021 | 2022 | 2023 | 2024 | 2025 |
| Part A&B Plan Premium | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Part B Only Plan Premium | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Humana argues that United's interpretation of the statute asks us to re-write the statute to modify the "for which there is not a cost" language to apply only to a cost borne by the state agency. Humana argues that the proper reading of the statute is that any contract involving an exchange of funds between a state agency and a contractor—regardless of whom bears the costs—is subject to mandatory disclosure under section 2261.253, unless some exception applies.

The PIA does not include the definition of "cost." The dictionary definition of "cost" is "the amount or equivalent paid or charged for something." *Cost*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cost (last visited May 2, 2024). We conclude that United's choice to offer a $0 premium (allegedly as part of United's admitted business strategy)

15

does not mean that the Contract meets the definition of a "contract for which there is no cost" under subsection (d).

Even assuming that the Contract was administered to TRS at absolutely no cost to them—premiums or otherwise—we cannot say United bears no cost in administering the program—and subsection (d) makes no distinction as to which party bears the cost.[4] Here, both parties incur some form of cost to administer the program. First, despite a $0 premium, TRS's "cost" to administer the program exists in another form—appropriated funds. The Contract provides an entire section on "Pricing and Compensation," and specifically states in Section 12.2(a) that "the Program is to be funded exclusively from the assets of the Retired School Employees Group Insurance Fund, and the assets of the Retired School Employees Group Insurance Fund shall be the exclusive source for all funding of benefits, costs, payments, liabilities and expenses arising under the Program or pursuant to this Contract" and that "[t]he Legislature of the State of Texas appropriates funding for the Program on a biennial basis."

Exhibit A to the Contract provides that TRS "shall submit monthly invoices by electronic mail to the attention of TRS Accounts Payable." In addition, Exhibit E provides that "[f]unds used to finance the program are held by the State Comptroller until withdrawn by [TRS] for purpose of investment, payment of administrative costs, payment of retention charges, or reimbursement for payment of claims" and monthly invoices submitted by United to TRS for billing and administrative fees. As to United's costs, United admits that it will or could incur costs

---

[4] Section 552.003 (Definitions) considers "contracting information" to include "information in a voucher or contract relating to the *receipt or expenditure* of public funds by a governmental body." *See* Tex. Gov't Code § 552.003(1-a), (A). Based on this definition, we cannot conclude that the Legislature intended to define contracting information between the state and a private vendor as describing only those contracts where the state bears the cost.

as a result of paying TRS "credits" or "gains" in accordance with the gain-sharing arrangement. Exhibit B to the Contract also mentions United's financial "risks" associated with the Contract.

Based on United's interpretation of the statute, private vendors could easily skirt the intentions of the PIA by offering $0 premiums for a service that will be eventually funded, in some way or another, with taxpayer dollars. This interpretation is not consistent with the amendments' purpose of providing greater transparency in government contracts funded by taxpayer dollars. *See* Texas S.B. 943, Bill Analysis, Author's Statement of Intent (June 11, 2019), available at https://capitol.texas.gov/tlodocs/86R/analysis/pdf/SB00943F.pdf#navpanes=0 (last visited May 2, 2024). Taking the plain meaning of the word "cost" in the context of the Legislature's intent, we conclude that section 2261.253(b)(1) applies to the requested information at issue and that subsection (d) does not apply, and therefore United is prohibited from utilizing the exceptions to disclosure in 552.110 and 552.1101. To conclude otherwise would be to provide private vendors with an unintended loophole to prevent disclosure of their contracting information as it relates to state agencies. *See* Tex. Gov't Code § 312.005; *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008) (our primary objective is to give effect to Legislature's intent as expressed in statute's language). Accordingly, we affirm the portion of the trial court's order affirming the AG's Order to the extent it determined TRS disclose the information in Request No. 1 on this basis.

17

**II.** **Whether the contract or offer terms or their functional equivalent in the Contract (Request No. 3) and United's response to Request for Proposal No. 19-0000184 (Request No. 4) that are identified in sections A through J of Tex. Gov't Code § 552.0222(b)(3) must be disclosed**

*A.* *Whether section 552.0222(b)(3) applies to the requested information*

We next turn to section 552.0222(b)(3). *See* Tex. Gov't Code § 552.0222(b)(3). In addition to section 552.0222(b)(1), the trade secrets and confidential or financial information exceptions do not apply to contracting information as defined by section 552.0222(b)(3). Section (b)(3) provides:

> (b) The exceptions to disclosure provided by sections 552.110 and 552.1101 do not apply to the following types of contracting information:
>
>  . . .
>
> (3) the following contract or offer terms or their functional equivalent:
>
>> (A) any term describing the overall or total price the governmental body will or could potentially pay, including overall or total value, maximum liability, and final price;
>> (B) a description of the items or services to be delivered with the total price for each if a total price is identified for the item or service in the contract;
>> (C) the delivery and service deadlines;
>> (D) the remedies for breach of contract;
>> (E) the identity of all parties to the contract;
>> (F) the identity of all subcontractors in a contract;
>> (G) the affiliate overall or total pricing for a vendor, contractor, potential vendor, or potential contractor;
>> (H) the execution dates;
>> (I) the effective dates; and
>> (J) the contract duration terms, including any extension options; or

18

*Id.* Like our analysis of section 552.0222(b)(1) above, if the requested information meets any of the definitions included in (A)-(J), then United cannot utilize its claimed exceptions. *See id.* § 552.0222(a), (b)(3).

Humana's third and fourth requests directly track the language in section 552.0222(b)(3). Specifically, Humana's third request seeks "[a]ll contract terms, or their functional equivalent, in the Contract with [United] that are identified in Tex. Gov't Code Section 552.0222(b)(3), [including items listed in (A)-(J)]" while the fourth request seeks "[a]ll offer terms, or either functional equivalent, made by [United] in response to Request for Proposals No. 19-0000184 that are identified in Texas Government Code Section 552.0222(b)(3)." Using the same logic from the section 2261.253 argument, United claims that none of the items in (A) or (B) apply to the information requested because "both provisions apply only to contract terms involving a *cost* to the governmental entity." Specifically, subsection (A) requires disclosure of the *overall or total price the governmental body will or could potentially pay*, while subsection (B) requires disclosure of the *items or services with the total price for each*. We discuss each in turn.

### 1. Subsection (b)(3)(A)

Unlike Section 552.0222(b)(1), we note that subsection (b)(3)(A) defines the bearer of the cost—here, it is the government entity. United claims that it receives funds from CMS and that those funds are what are used to pay member claims. Accordingly, United argues, "[b]ecause TRS will not and could not potentially *pay* any price for the services United is rendering under [the Contract], these provisions do not require disclosure of the information sought." Specifically, United claims that the withheld parts of Exhibit A to the Contract (the gain-sharing arrangement) deal with "credits" or "gains" that TRS might *receive*, but not pay. Humana reiterates its position

that "United is not providing these services pro bono" in that appropriated state funds pay, at least in part, for the TRS-Care program. In addition, Humana asserts that an actual "price" or "cost" is unnecessary because subsection (A) seeks "overall or total *value*." Value is commonly defined as "the monetary worth of something" or "a fair return or equivalent in goods, services, or money for something exchanged." *Value*, Merriam-Webster, https://www.merriam-webster.com/dictionary/value (last visited May 2, 2024). We have to presume that the Legislature included the term "overall value" for a reason. *See First Am. Title Ins.*, 258 S.W.3d at 627 (courts' primary objective in construing statutes is to give effect to Legislature's intent as expressed in statute's language). There is a value to TRS in paying United a $0 premium and there is also a value to TRS in receiving "credits" or "gains" from the Contract's gain-sharing arrangement. Accordingly, we conclude that section 522.0222(b)(3)(A) applies to the information sought in Humana's third and fourth requests, and United must disclose "the overall or total price the governmental body will or could potentially pay, including overall or total value, maximum liability, and final price." Tex. Gov't Code § 552.0222(b)(3)(A).

### 2. Subsection (b)(3)(B)

Regarding subsection (B), United argues it is likewise inapplicable to the requested information because there is no "*price*" associated with United's services. Humana responds, once again, that appropriated funds pay, at least in part, for the TRS-Care program.

Price is commonly defined as "the amount of money given or set as consideration for the sale of a specified thing" or "the quantity of one thing that is exchanged or demanded in barter or sale for another." *Price*, Merriam-Webster, https://www.merriam-webster.com/dictionary/price (last visited May 2, 2024). Here, the $0 premium meets this

20

definition: TRS pays $0 in exchange for United to administer the TRS-Care Program. The price may be zero, but it is still a price. Therefore, we conclude that section 522.0222(b)(3)(B) applies to the information sought in Humana's third and fourth requests, and United must disclose "a description of the items or services to be delivered with the total price for each if a total price is identified for the item or service in the contract" that it is providing even though the price is zero. *See* Tex. Gov't Code § 552.0222(b)(3)(B).

Accordingly, we affirm the portion of the trial court's order affirming the AG's Order to the extent it determined TRS disclose the information in Requests No. 3 and 4.

**III.    Whether the unredacted copies of the BAFO requests and responses between TRS and United relating to request for proposals No. 19-0000184 must be disclosed (Request No. 2)**

Humana's second request sought all documents and communications related to TRS's BAFO requests to United, and United's responses to same. United argues that its BAFO responses are not subject to disclosure because they contain proprietary and confidential bid information (section 552.1101(a)), trade secrets (section 552.110(a)), and commercial or financial information that, if disclosed, would cause substantial competitive harm (section 552.110(c)).

The first BAFO request requested the bidders to provide their "Best and Final pricing" for both premiums and gain-sharing arrangements. The first BAFO request indicated that the bidders would not be given another chance to update their pricing. Humana extrapolates this request to mean that TRS considered the price of the Contract to be made up of two components: premiums and gain-sharing. The second BAFO request sought responses from bidders about their willingness to share with TRS any overpayment of premiums received from the federal government (i.e., gain-sharing). Specifically, TRS asked bidders: "TRS would like to know if

21

your firm would be willing to either: (1) provide the shared savings payment in excess of the TRS premium or (2) hold any shared savings in excess of premium into an account to be used for future premium offsets." In its BAFO response, Humana expressed concerns that TRS's request to "share savings" may violate CMS regulations and the federal antikickback statute. This concern is what Humana asserts originally prompted Humana's public information request at issue.[5] Based on the information Humana was able to gather from TRS's partial disclosure, United's response to this question resulted in TRS asking United's legal team to issue a formal certification. Humana argues that this legal certification, along with the rest of United's BAFO responses, do not fall into any PIA exception and are therefore subject to disclosure.

United's summary judgment evidence (the Condon affidavit) explains that: "both the first and second BAFO submissions, the original United bid and any email exchanges related to terms, approvals, or certifications, constitutes a total financial and service package that United offered and delivered to TRS that was developed through, and reflects, a proposal formula that is unique and proprietary to United, maintained as confidential, and is what differentiates United from Humana and other competitors of the marketplace." *See id.* § 552.1101(a) (proprietary bid information). Condon further avers that the information sought "includes the yearly fully insured rates for all divisions and plans, how the rate is built and developed, whether the proposal will include rate guarantees, performance guarantees, and any gain share, the scope and duration of the guarantees etc." Condon asserts that this information "forms the basis for why United is so

---

[5] Contrary to United's argument, Humana's motivation for its PIA request is irrelevant because this Court has previously held that the PIA prohibits inquiry into the motives of the party requesting the release of information. *See Boeing Co. v. Abbott*, 412 S.W.3d 1, 6 (Tex. App—Austin 2012) (citing *A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 676 (Tex. 1995)) *rev'd on other grounds, Boeing Co. v. Paxton*, 466 S.W.3d 831 (Tex. 2015).

successful in the marketplace" and that "the disclosure of which would substantially harm United and benefit its competitors in future procurements, local and national." Humana argues that Condon's affidavit fails to create a fact issue as to whether section 552.1101(a) applies. We agree with Humana.

### A. Whether the BAFO responses constitute confidential and proprietary bid information under section 552.1101(a)

Section 552.1101(a) provides:

> (a) Except as provided by section 552.0222, information submitted to a governmental body by a vendor, contractor, potential vendor, or potential contractor in response to a request for a bid, proposal, or qualification is excepted [from disclosure] if the vendor, contractor, potential vendor, or potential contractor that the information relates to demonstrates based on specific factual evidence that disclosure of the information would:
>
> (1) Reveal an individual approach to:
>
>   (A) Work
>
>   (B) Organizational structure
>
>   (C) Staffing
>
>   (D) Internal operations
>
>   (E) Processes; or
>
>   (F) Discounts, pricing methodology, pricing per kilowatt hour, cost data, or other pricing information that will be used in future solicitation or bid documents; and
>
> (2) Give advantage to a competitor.

*Id.* These exceptions listed in subsection (a), however, do not apply to information in a voucher or contract relating to the receipt or expenditure of public funds by a governmental body. *See* Tex. Gov't Code § 552.1101(b)(1). Here, the Contract's section on pricing provides that the public

23

funds are the "exclusive source for all funding of benefits, costs, payments, liabilities and expenses arising under the Program or pursuant to this Contract." Further, United admits that it may be paying federal public funds back to TRS through the gain-sharing arrangement. Both BAFOs relate specifically to the Contract price which, logically following, relates to the expenditure and/or receipt of public funds. Therefore, for the foregoing reasons, we conclude that United's summary judgment evidence failed to create a fact issue as to whether section 552.1101(a) could be utilized as an exception to disclosure.

### B. Whether the BAFO responses constitute trade secrets (section 552.110(a)) or commercial or financial information (552.110(c))

Based on our review of the record, both parties agree that the premiums and gain-sharing agreement terms included within the first and second BAFOs are the same price terms that are in the Contract. United disclosed the price of its premiums but seeks to withhold the other financial component of the Contract—the gain-sharing arrangement. The Condon affidavit states that the gain-sharing arrangement as "a unique pricing formula prepared specifically for the TRS bid" and that its terms were "highly customized" for the TRS bid.

The same principles we applied in our earlier analysis regarding Request No. 1, (*see* § I, *supra*) apply to the pricing and gain sharing arrangements contained in United's first and second BAFO responses. Because United admits that the gain-sharing arrangement was made part of the Contract, it describes and constitutes the overall and total price or value of the final Contract and a description of the items or services to be delivered with the total price for each, and it is therefore not subject to withholding under §§ 552.110 or 552.1101. *See id.* § 552.0222(b)(3)(A), (B) (providing that exceptions in sections 552.110 and 552.1101 do not apply to contract terms "describing the overall or total price the governmental body will or could potentially pay, including

24

overall or total value, maximum liability, and final price" or contract terms that provide "a description of the items or services to be delivered with the total price for each"). *See id.* § 552.0222(b)(3)(A). Accordingly, we affirm the portion of the trial court's order affirming the AG's Order to the extent it determined TRS disclose this information in Request No. 2 on this basis.

## CONCLUSION

We conclude that United did not demonstrate that the requested information falls within any exceptions in the PIA that would prevent its disclosure. Therefore, we affirm the trial court's judgment.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: May 3, 2024

25